2726 Kirschner v. JP Morgan, etc. May it please the court. Christopher Johnson for the trustee. I'd like to focus my argument on two issues. The scope of EDGE Act jurisdiction and whether the notes here are securities. On the first issue, this court held in AIG that EDGE Act jurisdiction requires that the suit arise out of an offshore banking transaction of a federally chartered corporation. Here, the banking transaction was domestic. JP Morgan National Association's $1.8 billion loan to Millennium. To be sure, JP Morgan Securities, a broker-dealer, marketed a syndication of that loan to what the parties call the parent investors. And the 61 parent investors, 59 domestic and 2 foreign, then selected the foreign and domestic child investors who ultimately- You have an assignment of the term loan that is at issue here where the foreign entities, hundreds of them I think, you can correct me if I'm wrong, are directly transacting with the bank. Correct, Your Honor. So unlike the cases you cite where the transaction was not part of the claim, it was attenuated, explain to me how the assignment where the foreign entities are parties to the assignment, which you can correct me if I'm wrong, is a central transaction with respect to this case. Or am I wrong on that? Sir, Your Honor, there were foreign entities who took assignments of the loan, but- And the bank, they're directly transacting with the bank on that. I don't think there's any case where you have that kind of direct transaction with foreign entities on a transaction that's central to the case, where yet we say the bank, it's not under the EDGE Act, the bank doesn't get the protection or the benefit of the EDGE Act. You can correct me if I'm wrong. I understood, Your Honor. The point is that the foreign investors came into the transaction solely by virtue of the efforts of a broker-dealer- I don't understand why that would matter. Just because the bank wasn't actively soliciting the foreign investors, if they're actually transacting with them by whatever means, however it happened, they're directly transacting with the foreign entities on a transaction that's central to the EDGE Act. The purpose of the EDGE Act is to have uniformity when you're dealing with foreign entities like this. Understood, Your Honor. The point is that federally chartered banks today are far different from what they were in 1919 when the EDGE Act was passed or in 1933 when the Glass-Steagall Act added a jurisdictional provision. The barriers that Glass-Steagall had once erected between commercial and investment banks have been dismantled. And as this case shows, federally chartered banks like J.P. Morgan, N.A. now work hand-in-hand with investment banking and broker-dealer affiliates. And those affiliates operate in a global market. So if the independent decisions of a broker-dealer or a hedge fund can trigger EDGE Act, then federal jurisdiction will expand far beyond what Congress ever intended. Because when Congress removed Glass-Steagall's barriers, it didn't change the scope of EDGE Act jurisdiction. May I ask, when you're answering the question, if you could speak to whether you think your case is squarely within AIG or do you think we have to extend it because of the change circumstances that you're pointing to? It's tough to say that it's squarely within AIG. I do think that this is an extension of the concept that the jurisdiction depends on an act of the federally chartered bank. But let me move to the second issue, if I may. This is the first case to consider whether syndicated loan notes are securities under Reeves. And although Amici for both sides tell this court that loan syndications now constitute a $2.5 trillion market, that's 10% of the nation's GDP, the lower court resolved this issue of first impression on the pleadings. Under Reeves, of course, notes are presumed to be securities unless they fall into a recognized exception. And all we're saying is that if the defendants want to rebut that presumption and demonstrate that these notes fall into an exception, that requires facts and discovery and should not have been determined on the pleading. But what if the undisputed facts from the pleadings would establish that it's not a security? So I understand there's certain things regarding motivations that you allege different motivations and they're saying the motivations were. But I think, again, correct me if I'm wrong, that we have something that's not available to the general public. It's only sophisticated investors, a relatively small number, a couple hundred sophisticated investors. All the relevant documents make clear that this is a loan. On its face, it's a loan. It's referred to as a loan, as to a lender. And you have government entities, the OCC, the FDIC, and the Federal Bank, to some extent, who can regulate these transactions, I think, as much as they want or as little as they want. And we would say in that situation, under the Reeves test, that those are sufficient, notwithstanding what other factual disputes there might be. For us to say confidently, especially in light of Bankoa's spending, that this is not a security. Why would that be wrong? That would be our holding. The cases where this is resolved on the pleadings are simple cases involving the purchase of a business and do not involve a $2.5 trillion market. And what I say about the plan of distribution, what's the plan of distribution? The plan of distribution here is that this is not going to the general public. It cannot, you can correct me if I'm wrong, cannot go to a natural person at all, in the secondary market. Correct, but there are securities issued every day, private placements of securities that cannot be traded among the general public. That's not the test. The test under Reeves is whether there is common trading of the instrument for speculation or investment. And here what the trustee alleged was that to demonstrate common trading, the trustee alleged a fluctuation in prices of the notes over time, which implies a fluctuation in demand for and supply of the notes. The trustee also alleged that J.P. Morgan Securities assigned a high yield research analyst to monitor trading and to provide information to new investors. Is that different from Banco Espanol or not? Excuse me? In the Banco Espanol, was that subject to fluctuating with the loans and that? No, there was not. Banco Espanol involved loan participations purchased by banks from a bank. Here the whole purpose of the transaction was for the bank to offload what is now known as a term loan B, something that banks do not participate in because of the lack of covenants. We even quoted a J.P. Morgan banker saying that banks do not play in these loans. And so that makes it far different from Banco Espanol where they were banks purchasing loans from other banks. How should we interpret the SEC's silence in this case that they haven't filed an amicus brief or asked to weigh in on this and say the district court got it wrong? Should we read anything into that or not? Your Honor, I would not read anything. They're certainly aware of this case. They may be, but frankly this is just a procedural issue of whether the district court should have resolved the issue on the pleadings. If the case goes back to the district court for discovery and I'm confident that there will be a summary judgment motion made on the issue, at which point I would be surprised if the SEC did not weigh in. If the SEC thought as a matter of law that this was unsettling the markets in a way that was inconsistent with their understanding of the term security versus loan, you would think they would have weighed in, right? Like I said, I'd wait to see what we do because if we affirm the case is over, there isn't going to be any summary judgment. The case is going to be over. If they thought this was wrong, you'd think they would be right where you're standing, but I don't know. So, Your Honor, I see him. No, go ahead. Don't worry. With respect to Banco Espanol, the defendants treat it like this case has already been decided, like it's a fait accompli. Procedurally, Banco Espanol was decided on a summary judgment record after discovery. It provides no basis for overriding Reeves' presumption at the pleading stage. Can I ask about Pollock, though? Is Pollock one of the cases that you think is really simple? Because Pollock applied Reeves and Banco Espanol in a motion to dismiss setting, right? Right. And it reversed to find that the notes there or the instrument there were securities. But the question is, is that can this be resolved here? I mean, you're making it sound like there's too many facts here. And I'm saying, well, they resolved it and went in a different direction in Pollock, but they resolved it. So there's at least some precedent for deciding that as a matter of law, these issues can be resolved. I don't disagree, Your Honor. What I do think is that this is the first case to address an instrument that is now a $2.5 trillion market. And I think that discovery, if the defendants want to rebut the presumption, the party should engage in discovery and let the court below decide the issue on a full record, as was done in Banco Espanol. Shouldn't this actually be resolved by Congress, right? If we get it wrong in either direction, couldn't Congress come in and say, this is a security? They could, but with all due respect to Congress, it's tough to get Why couldn't the OCC or the FDIC or the Federal Bank wait? If they think investors need more protection, they could put all kinds of regulations on banks. They don't need the SEC to do that, right? Couldn't they do that? I understand your point is that they haven't done that. But the question is, is this regulated by some government entity? And I think the answer to that is yes, right? So, Your Honor, the regulation issue in Reeves is whether there is another regulatory regime that, other than the securities laws, that protects the investors. And there is nothing about the OCC, FDIC or Federal Reserve Board guidance addressing banks that protects the investors here, none of which is a U.S. bank. And so the court in Banco Espanol, it made perfect sense for that court to rely upon OCC and FDIC guidance because they were banks purchasing participation from other banks. But those regulations do nothing that OCC could have the same conclusion here, that these are sophisticated investors with disclaimers and it's buyers beware. We don't need regulation in this area because everybody knows with their eyes wide open. They could do it, but they have decided that they don't need to do it in this context, in this industry. Could they do it? If they wanted to. I know you don't think that's the test. Well, they haven't done it. If they wanted to, couldn't they put restrictions on banks and tell them that certain things, notwithstanding whatever disclaimers they want to put in the documents, they're going to be liable if they make a misrepresentation or if they conceal something. Couldn't the OCC do that tomorrow if they wanted to? I don't know if they could, but what I do know is that they haven't. And currently there's no regulatory regime. This is a test under Reeves. Is there another regulatory regime other than the securities laws that protects the investors? And there is none today. And I recognize Amici, I believe, supporting the sponsor, say that, well, the investors here could protect themselves. But that makes our argument, Your Honor, because what it says is there is no regulatory regime protecting investors. There's only caveat emptor. And the whole purpose of the securities laws, according to the U.S. Supreme Court, was to displace caveat emptor in the purchase and sale of securities. Mr. Johnson, we've been discussing both the EDGE Act and the question of what is a security in complex, somewhat abstract terms. And I'm a simple sort of fellow. Tell me what you're trying to achieve for your clients. Describe for a layman, as it were, who your clients are, what they want, and what you think you would be achieving if you prevailed on the EDGE Act question and the security question. So our client is a trustee who represents a trust. The investors in this loan, and they were investors, are own interests in the trust. So any recovery goes to them. What are we trying to achieve if we prevail on the EDGE Act? Yes, focus on the EDGE Act first. So assume for the argument that you prevail on that. What have you achieved for your clients? It goes back to state court and all of the issues will be reviewed anew by a different court. All of the issues. So the net result of success on the EDGE Act question would be to effectively move all of these matters to the state courts. I'm just sort of curious. Why do you think that's a good thing? We sued on state securities laws. We also asserted common law claims. I understand. Why is that something that is desirable for your clients to be in the state Supreme Court as opposed to our system? I'm just looking at this from the standpoint of clients and lawyers trying to achieve the objectives of clients. What have you achieved by that? Or what would you achieve? The case was originally filed by other counsel in state court. The defendants had the burden of demonstrating federal court jurisdiction. We don't think they did. I understand. Assume you prevail on that question. What have your clients achieved? What have you done for your clients? The clients will be able to pursue the securities laws, the securities claims. In the state system, would you regard as more favorable in these circumstances? No? Yes. Otherwise it would be a very abstract sort of concern. No, I understand. That's why it was filed in state court in the first place because these were state law securities claims and also the common law claims. The thought was, presumably, we weren't involved at that point, that that would be a good forum for these claims. Why is that? I'm not sure. No idea. To make the argument on the EDGE Act very abstract, I'm just trying to figure out what you want. Let's put it another way. What is the decree that you would have us enter at the end of the day? In this case, what do you want us to do? Obviously, one option is to reverse on the EDGE Act and send the case back to the state court. Let's pass over the EDGE Act for the moment. Let's move to the question of securities. What we would ask is that the court reverse the dismissal below and send it back to the lower court for discovery regarding the Reeves factors so that if the defendants want to rebut the presumption in our favor, they do so on a full record and the court can consider the full record regarding all of the Reeves factors relating to this $2.5 trillion market. Describe to me very briefly what you imagine you would do if you succeed in this respect. Before the district court, describe just briefly what kind of discovery is it that you would be seeking? The motivations of the parties, obviously. If the issue is what were the motivations of the investors, the defendants say that they were lenders. I think that conducting depositions of the people who purchased. Bear in mind, these are hedge funds. What hedge funds do is they buy securities. If the price goes up, they sell the security. The $1 million trading restriction is no restriction at all for a hedge fund. So they're trading for investment. I think that we could demonstrate that through discovery regarding the plan of distribution. I think that we could take fact and expert discovery regarding how there is common trading of the instrument for speculation or investment, which we believe there is. And at the end of the day, what is the judgment that you imagine you would secure before the district court? A judgment that the defendants violated the securities laws of the four states whose laws under which we sued. Thank you. Mr. Wall. Judge Cabranes may please the court. I'd like to turn briefly to Judge Bianco's question on jurisdiction before handling the Reeves question and finally Judge Cabranes coming back to what the plaintiff's endgame is here. On jurisdiction, Judge Bianco, the EDGE Act asks two things. Were there foreign banking transactions and does this case arise out of them? I don't take the trustee to dispute either of those things. What the trustee says is those transactions are just a fortuity with foreign lenders because they were solicited by others that were not the EDGE Act banks themselves. The text of the EDGE Act doesn't care about that. I'm not aware of any case in this circuit or any other that cares about that. And the handful of cases that the trustee has pointed to as we tried to explain in our brief, and as I think the court will see when it digs into them, are cases in which the court either said it didn't arise out of the foreign transaction or more commonly there was no transaction between the EDGE Act bank and a foreign lender. To go to where the trustee and the panel spent most of their time, which is the Reeves question, I think it's even stronger, Judge Congress and the regulators have done in the interim. In the Dodd-Frank Act in 2010, Section 619 of the Dodd-Frank Act, which is now codified at 12 U.S.C. 1851 G2, says nothing in the Dodd-Frank Act should be construed to restrict the ability of banks to sell or securitize loans. Congress specifically said in Dodd-Frank, we are not touching the loan syndication market. And in the Volcker Rule, most recently in 2020, the banking regulators and the SEC agreed that CLOs, which are entities that hold a large number of these loans, could hold up to 5% debt securities, which was a recognition by the regulators, the banking regulators and the SEC, that all of the loans that these CLOs were holding, loans just like were purchased here, are not themselves securities. And the reason for that is that as the SEC told the Supreme Court 30 years ago in Banco Espanol, the banking regulators don't see any problem in the loan market, and there isn't any problem to date because of the way that market has developed. So to go to your question, Judge Bianco, there are only sophisticated purchasers. We know everybody who bought these loans. It's at pages 163 to 170 of the JA. The court looks at the list. This is BlackRock, KKR, Goldman. Even the names say loan. Credit Suisse Loan Funding, Invesco Senior Loan Fund. These are institutional entities that buy and trade loans all the time, every day, in large quantities. And the reason... What about the secondary market? The second, the restrictions in the under Reeves, if it expands the plan of distribution in order to pick up what the court was worried about in Pollack, right? John and Sally Public, who were just buying through their investment advisor and putting it in their retirement portfolio. The secondary market is the same as the original market. It can't go to natural persons. You've got a million dollar limit on trading unless you are a lender, an affiliate, or an approved fund, which is a fund managed or administered by a lender or affiliate. This is all taking place in a confined universe of very sophisticated repeat players who know a handful of things. They're on ample notice that it's a loan. The credit agreement says again and again it's a loan. These are lenders. It's a borrower. They're capable of doing their own diligence. And we know that they do do their own diligence. If you look in the JA, page 949, there's an email within JP Morgan because Oak Tree, one of the lenders, reached out to JP Morgan's outside counsel to say, what are the worst case scenarios for the Ameritox litigation and for the DOJ investigation? So it's not just that they're capable of doing it. They do do it. And some lenders did the diligence and walked away from this loan. Some lenders did the diligence and decided they wanted to make the loan to Millennium. But the point under that is, is it a broad swath of the investing public who can't do their own diligence? Or is it going to a subset of sophisticated players who are capable of doing their own diligence and indeed who want to do their own diligence? There are lenders who want to access material non-public information and trade on the basis of it. Not all of them. Some can choose to be public side. But some want to be private side. That's not a choice you have under the securities laws. So it's not just that they know they're operating outside the protection of the securities laws. There's a material benefit to them, or at least the option of a material benefit to them, to be outside that regime. All of it's overseen by the banking regulators who have overseen this for the last 30 years. This is a lending. This is what banks do. It is much more sensibly within the purview of the OCC. So if someone said this is similar to the high-yield bond market, that would be the distinguishing characteristic where you would say this is different? I would say it's different for a handful of reasons. It bears certain similarities, but it's typically less risky because it's secured by a lien. You have more flexibility in the way that you can deal with the terms than you do with a bond. And from the borrower's side, you can control who buys the loans because you have to consent, which you can't do on the other side on the bond market. So no one disputes that these markets have grown up in parallel and that the products bear some similarities, but they have long been understood to be different. High-yield bonds are securities and they're handled by the SEC. Leveraged loans and syndicated loans are handled by the banking regulators because at the end of the day, they're loans, they're not securities. And to just take a step back and to see the forest for the trees, everybody agrees, I think even the trustee agrees, that if the banks lend money to Millennium, that's a loan, not a security. And I think they agree that if the private lenders want to loan money to Millennium, that's also a loan, not a security. Same thing as here. Fixed term at at least a fixed rate pegged to LIBOR, it's a loan. Nothing changes because those two things happen one after the other. Because J.P. Morgan loans the money to Millennium and then sells pieces of the loan to Credit Suisse Loan Fund or Invesco Senior Loan Fund, right? All it is doing is it's come up with, we have a market that has come up with a way to arrange or bundle or facilitate a number of private loans all taking place to the same borrower on the same terms. And nothing about that converts it into a security. That's what Banco Español said 30 years ago and it remains as true now. And then to your question, Judge Perez, that really leaves the trustee with just, well, but I've pleaded enough that I ought to be able to get past the motion to dismiss, right? Pollack was a motion to dismiss. The 5th, 9th, and 11th circuits, we have cases in our brief have taken this on a motion to dismiss. And district courts in this circuit have done this on a motion to dismiss. Judge Gardefee cited those cases at page 222 of the joint appendix. It is just not plausible, Judge Gardefee said, and he's right, that anyone coming to this transaction could possibly have understood it to be a security, not a loan. They've still got to get past Twombly. There's nothing new about Twombly as applied to Reeves. They've got to plausibly allege that they have a security. Let me put the motivation factor at least sort of off to the side because I think their argument is they allege different motivations than you're saying were the motivations that would make a commercial. So if we are going to decide at the motion to dismiss stage, we would have to decide on the other factors, not on the motivation factor, right? Well, so two things, Judge Bianco. First, I don't think that's right because what Reeves asks is what are the motivations of a reasonable buyer and seller. It doesn't ask, it's an objective test. It's not a subjective test. It doesn't ask about the idiosyncratic motivations. It looks at the transaction and says, what would two reasonable parties have come into this transaction have done? That's an objective test that could be done at the motion to dismiss. But even if you didn't think I was right about that, Judge Gardefee gave the trustee the benefit of the doubt on this and said, look, you know, okay, clearly Millennium is not raising this money to do general operations or substantial investment. That's the language of Reeves. So it's commercial. All right, fine. I'll say that the trust, the lenders were acting for an investment motivation. So I think it's a wash. And then Judge Gardefee moved on to the other factors and said, it has a limited plan of distribution. Everyone understood that this was a loan, not a security. And we have the same regulatory regime in place that Banco Espanol relied on 30 years ago. Indeed, I would argue an even stronger regulatory regime that has grown up around the expectations of this market. Keeping in mind, this is statutory stare decisis. I mean, this is supposed to be stare decisis at its peak. And you have a $2.5 trillion loan syndication market that has grown up in reliance on Banco Espanol. And I just take Judge Gardefee's opinion to have said, when you look at all of that, even if we treat the first factor as a wash, they just haven't plausibly alleged a security. Should we invite the SEC to weigh in on this? Should we invite, I think, does it happen in Banco Espanol? What do you think, SEC? Or should we not do that? I don't think so. I mean, if the SEC wanted to be here, it could. It's aware of this market. And for a very long, I mean, and the reason I say that I think we have reached a sort of stable consensus, the SG's brief in Banco Espanol was a compromise. The SEC told this court in Banco Espanol, sure, loan participations generally are not securities. But it had concerns about the particular participations in Banco Espanol. The banking regulators did not. And when the case went up to the Supreme Court, the SG said, well, I have some questions about Banco Espanol, the second and the fourth prongs. But the banking regulators tell me there's no note market. So don't grant the case. And we've proceeded for the last 30 years on a developed understanding that Congress has relied on and that is reflected in the Volcker rule that this is the purview of the banking regulators, not the SEC. If the SEC wants to unsettle that understanding, it could come in and file. But I think you'd also have to invite the views of the Fed, the OCC, and the FDIC, who actually have been regulating this market and who, by the way, put out interagency guidance in 2013 that addresses questions like disclosure for credit risks under the underwriting standard section. There's a lot of water under this bridge. Well, part of, I want to go there, but now that you mention interagency agreements, to follow up on Judge Bianco's query about the SEC, is there a forum or an interagency situation in which we could get the views of all of them, as it were? I know that's not easy. Very difficult, in fact. But is there any possibility that we could get the views of the banking regulators as well as the SEC? Judge Kipronos, I suppose that if the court invited the views of the agencies themselves, then it's unclear exactly what would happen, I think, within the government. I think the court could invite the views of the Department of Justice. We've done this before in some cases. Why don't we ask the Solicitor General of the United States to submit a brief? And then the organization of the government's interagency statement is the work of the Solicitor General. I think the court could invite Justice Prologer to put in a brief, or sorry, General Prologer to put in a brief, and she would be required to survey the agencies and then express the view of the entire United States. The reason I don't think that the court should do that in this case is because this isn't a question about whether to overrule Banco Español or whether to put this within the meaning of the securities laws. This comes up to the court on the question of did they plausibly plead that this is a security for purposes of the Reeves test? And what Judge Gardefee said was they can't distinguish Banco Español in any meaningful way. If he got that question right, I don't really see what General Prologer would add to that question. And Judge Kovanez, just to come back to where you ended the last argument, I think the end game here is fairly simple. This litigation started in 2017. It's been going on for six years. The effective plaintiffs, the one who stand behind the trustees, are the funds that purchased and assigned to their claims over. It's the Black Rocks and the Goldmans of the world who made a bad loan and have sued to try to get some money on the loan. They say again and again discovery. The trustees succeeded to all of Millennium's documents. Every piece of paper Millennium has. Hundreds of thousands of documents in the bankruptcy and then hundreds of thousands of documents more in the parallel Delaware litigation. The trustee is awash in documents. This is not about discovery. It is about surviving a motion to dismiss in order to try to force a settlement whether in federal court or state court. The trustee, I cannot believe, thinks that at the end of the day when you actually do discovery and you talk to all the people who work at these CLO and loan funds, that they are going to testify that they thought they were buying securities when for 30 years their entire business model has been based on the notion that these are loans and not securities. This isn't to secure a final judgment on the merits. It is to coerce a settlement. What about the parallel litigation in Delaware? What can you tell us about that in short? I actually have not been involved with the parallel litigation in Delaware. I know there's been extensive discovery. I think there's briefing in front of that court. I'm not sure what the status of the briefing is, but we could I assume so. I believe he is. All right. I think we could use the assistance of a letter, four or five pages at most from each of you, from each side, telling us what you think is going on in Delaware and why we should know about it or ignore it. Now let me back up, Mr. Wall, on one matter. You do have this stack of appendices and you've been very good in tossing out a reference to a page. You refer to page 949. Maybe you could just walk me through what you think I'm supposed to learn from page 949 other than the very large lettering that says redacted. Sure, Your Honor. It goes beyond redacted. This is an email within folks in the leveraged finance group at J.P. Morgan who work on these loans. And one of them is saying to the other, I just got a call from someone at Oak Tree, that's one of the lenders, and Lynn is a lawyer at Simpson Thatcher who was J.P. Morgan's outside counsel. So basically saying one of the lenders called our outside counsel to ask about the Ameritox litigation. And Lynn said that the exposure, which is the amount that Ameritox asked for in its complaint, is $200 million and then $20 million on this other patent case. And then says that's the first time I've heard the number. I want to talk to you about it. And said also on the DOJ side, she wants to dig in to understand some potential worst case scenario precedents. So the reason I pointed out the email, and there's other evidence like this in the record, is these were lenders who didn't just know that they were required to do their own diligence by the terms of the contract and because they weren't under the protection of the securities laws, but actually did their own diligence. And having done the diligence, some bought the loan and some walked away from the loan, and that's the way that the market is supposed to work. And that's why the SG said to the Supreme Court 30 years ago, the banking regulators don't see a problem in the loan market, and the market has grown up in a way where there is no problem. Because it's now a standard term in the industry that you can't go out to the public. You can't sell to John and Sally Q. Public. So it's BlackRock, it's KKR, it's Goldman, it's Credit Suisse, BNP Paribas, Deutsche Bank. The list is in the JA from pages 163 to 170. These are sophisticated repeat players who know exactly what they're doing and who are well capable of performing diligence outside the purview of the securities laws. If there are no questions on the common law claims, we would ask that the court affirm. Thank you. Thank you, Your Honor. Reeves gives us a presumption in our favor that the notes are securities. Case law tells us that the lower court was supposed to give us every inference on the pleadings, but basically what we just heard were all the facts as to why defendants think we're wrong. That what Congress and Dodd-Frank intended, that the banking regulators don't see any problems, that the hedge funds buy and trade loans every day, that they're all repeat players, and that it was all long understood that these things are not securities. Those are facts that if they want to develop to rebut the presumption in the trustee's favor, they can do it through discovery. My guess is that if a hedge fund were going to buy a syndicated loan note today, the first thing it would do is call its lawyer and say, are these things going to be regulated as securities? The lawyer would likely say, I don't know. The idea that there are settled expectations in the market, I don't think there are because Banco Español did not settle expectations in this market. Banco Español itself, it did not hold that the participation interests that the banks purchased in that case were securities. Immediately after so holding, the court said, quote, we rule only with respect to loan participations as marketed in this case, close quote. That's at 973 F 2nd 56th. And so if the court 30 years ago talking about a different product was saying, we're only talking about this product and nothing else, I don't know how that case could provide satisfaction or comfort to purchasers of these notes. Can I ask you to explain, though, then why would we have 30 years before this case is coming to us if it was disputed or if there was more in question? What would you explain for that? My explanation would be that every time this issue comes up, the banks settle so that the Second Circuit doesn't get a chance to resolve this issue. Going back for a second to the motivations of the parties, the issue under  current operations. That's not just inconsistent with our allegations. It's wrong. Millennium did not use this money to buy an asset, to open a plant. Under your argument, then, in every case, if someone loses money in this market and they sue for some type of fraud, we have to go into discovery to determine in that particular case, what are the motivations of the people who are involved in those transactions, right? In every case, you'd have to go to discovery to figure out. He's arguing that's not the way we're supposed to look at this. Not in every case. Objective, not subjective. Why were you investing here? That's what you'd be suggesting. Right, but the note holders here, what they're investing in, because Millennium took $1.8 billion and they paid a $1.2 billion dividend. They cashed out their equity sponsor and they refinanced the bank debt. They didn't keep a penny for current operations. Not a penny. So why did the note holders purchase the notes? They were betting on Millennium's ability to service that additional $1.4 billion in debt. That is an investment purpose. There is nothing about this that was like a commercial loan to help Millennium's business. And it's not like a commercial loan by a commercial bank because the whole purpose, as I said before, was to offload this from commercial banks to non-banks. I see my time's up. The court has any... Mr. Johnson, going back to Judge Pettis' question regarding why these portentous issues reached us so many years after the development of the market, you indicated that the parties always settled, presumably out of fear of what the courts might do. Or is there some other grand explanation for why there's always a settlement? My guess is that is precisely what happens. We're unpredictable. We're unpredictable. That's where the danger is. So these notes are most like high yield bonds. Even Amici supporting the sponsors say that. And so the banks have developed this market and they do not want it regulated by the SEC. And so if the issue comes up in a dispute out there... That's one of the things that I'm struggling with, the circularity of it. There's an argument that this is the way that it's done and so there's some sort of knownness on it. But then we have other folks saying, well, that's what's caused it to get so big and that's why we are needing to step in because folks are running amok because they're unregulated. And I'm just trying to ask you, can you explain what work you think Reeves Prompt 3 does? What is that supposed to tell us? How are we supposed to decide it? Because one can infer different things from the fact that this market has gotten to get so big. So the third factor is about the expectations of the public. And the lower court relied on the fact that transaction documents refer to this as a loan. Those same documents... Really? I mean, isn't part of it, it's gotten so big and there's so much money in it and everybody seems to be operating, I mean, for all the reasons that you said and for the reasons that your colleagues said, that they want to not have to deal with this regulation. So it's not quite just relying on what was articulated in the documents. And I don't mean to quibble with you, I just want you to answer the harder question is what I think, is the fact that there seems to be people making a lot of money and therefore spending a bunch of resources under the assumption that it's not coming under securities law. And that seems to me to cut both ways. It could cut for the idea that there's a giant loophole and courts need to come into it because the whole point of securities law is to make sure that there's not the kind of instability that happens from unregulation. But there's also the, you know, folks know what is happening and know that because there's money being made, people are moving toward that instrument. So tell me what you think we're supposed to get from Reeves 3. Okay, so Your Honor, forgive me if I sound like a broken record, but that's reason for discovery. Experts can opine on what the market actually expects and whether all the hedge funds out there who purchase these notes or notes like them expect that they're securities, expect that they're not securities, or expect that this is something to be determined in the future. And I think that the market expectations factor is a fertile field for discovery. And with the inferences that were supposed to be drawn in our favor, it should not have been resolved against us at the pleading stage, particularly when the lower court did so on the basis of the fact that those same documents are directed to investors and were converted into an investor presentation PowerPoint. Because Reeves said that the purpose in enacting the securities laws was to regulate investments in whatever form they are made and by whatever name they are called. That's 494 U.S. 61. And so if the parties out there are making investments, which we think they are, then they're securities according to Reeves. And if there's doubt about whether they are making investments or not, or whether they are lenders, then that is a fact to be subject to discovery, not resolved against the trustee at the pleading stage. Thank you. Let me turn to a clerical matter. To supplement the letter brief, which I mentioned earlier, I think it should be five pages, single space. That concerns the parallel litigation in Delaware to be filed by March 16, 2023. Very good. Thank you. Thank you. Thank you.